**In re A.T.**

**Appeal of the Philadelphia Department of Human Services.**

Superior Court of Pennsylvania.

Argued Oct. 9, 2013.
Filed Nov. 27, 2013.

Michael E. Angelotti, Philadelphia, for appellant.

Patricia A. Korey, Public Defender, Philadelphia, for appellee.

BEFORE: BOWES, J., DONOHUE, J., and OTT, J.

OPINION BY OTT, J.

The Philadelphia Department of Human Services ("DHS") appeals from the order in the Court of Common Pleas of Philadelphia County that directed DHS to provide a laptop computer to A.T., a "dependent child" pursuant to section 6302 of the Juvenile Act ("Act"), 42 Pa.C.S.A. § 6301, *et seq.*[1] We affirm.[2]

The juvenile court adjudicated A.T. dependent on June 29, 2011, when she was seventeen years old, and placed her in the custody of DHS. DHS established a placement goal of Another Planned Permanent Living Arrangement ("APPLA"). The juvenile court held regular permanency hearings pursuant to section 6351 of the Act. The permanency review orders reveal that A.T. resided in a group home. During 2011–2012, she attended and completed 12th grade at Audenried High School in Philadelphia, Pennsylvania. By July of 2012, A.T. was attending the Community College of Philadelphia ("CCP"). In addition, she was employed, attended individual and group therapy, and visited weekly with her two minor children, who were born prior to her adjudication. By October of 2012, A.T. was residing in a Supervised Independent Living Program through Valley Youth House, where she remained at the time of the subject proceedings. In addition, the permanency review orders reveal that during the entire time of her placement, A.T. maintained full compliance with her permanency plan.

At the permanency review hearing held before a master on January 11, 2013, A.T. testified that she is attending her second semester at CCP, and her classes include Spanish 102, English 102, and paralegal studies.[3] N.T., 1/11/13, at 5, 9. The Child Advocate advised the master that A.T. has a 3.0 average, and, further, that she needs a laptop computer. *Id.* at 5–6. Upon questioning by the master, A.T. testified she especially needs a computer for her English 102 class, because it is a research and writing class. *Id.* a 9–10. A.T.'s testimony continued as follows:

1. A.T. is a female who was born in December of 1993. At the time of the subject proceedings, she was nineteen years old.

2. The juvenile court issued the subject order after full hearing on reconsideration request-ed by DHS and granted by the court pursuant to Pa.R.A.P. 1701(a)(3).

3. A.T. testified that, when she finishes at CCP, she would like to attend a school with a law program. N.T., 1/11/13, at 5.

THE MASTER: Now, you have a computer available to you where?

THE CHILD: I can travel to Center City and get to AIC [Achieving Independence Center], provided that their computer lab is open or go to the computers at the Library, provided that they are open or CC[P], provided that they are open.

THE MASTER: Where do you live?

THE CHILD: In West Philadelphia.

THE MASTER: How would you travel back and forth?

THE CHILD: Usually the train and the bus.

THE MASTER: How much time does it take you to travel back and forth?

THE CHILD: To Center City, there are no buses that take me directly to the train from my house, so I would have to walk to the train, it's about 15 minutes, and the train ride is about a half hour.

THE MASTER: ... Do you have work to do on the weekend, or are you able to get all your class work done during the day?

THE CHILD: I prefer to work on the weekends, because it is easier that way, I have all day to work on it.

THE MASTER: Has there ever been an occasion that you have gone to the computer la[b] at CCP and not been able to get on the computer?

THE CHILD: Yes.

THE MASTER: Has there ever been an occasion that you have gone to the Free Library and not been able to get on a computer?

THE CHILD: Yes.

THE MASTER: Has there ever been an occasion that you have gone to AIC and have not been able to get on a computer?

THE CHILD: Yes.

THE MASTER: Is that because it was closed or because there were other children waiting to use it?

THE CHILD: It's either closed, or there are other people to use it, or there is a class at that time.

N.T., 1/11/13, at 10–12.

By permanency review order dated January 11, 2013, the juvenile court adopted the recommendation of the master that DHS provide A.T. with a desktop or laptop computer. On January 14, 2013, DHS filed a motion for reconsideration. By order dated January 24, 2013, the juvenile court granted DHS's motion for reconsideration.

The hearing on DHS's reconsideration motion was held on March 20, 2013, during which the DHS caseworker, Nea Hargrove, testified. The court incorporated into the record the notes of testimony from the permanency review hearing on January 11, 2013. At the conclusion of the hearing, the court stated on the record as follows:

> We are going to order that [DHS] provide a computer. I do think that it is in the best interests of the child due to the fact that she goes to Community College. She has good grades. And again, I just think it is in her best interests to have a computer to further her school work.

N.T., 3/20/13, at 9. By written order dated March 20, 2013, the court directed DHS to provide a laptop computer to A.T. DHS timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

DHS presents two issues for our review, as follows:

1. Did the [juvenile] court err or abuse its discretion in ordering that [DHS] provide the [c]hild with a laptop computer, where there was insuffi-

cient evidence for it to find that it was in the best interests of the [c]hild to enter that order?

2.  Did the [juvenile] court err or abuse its discretion in rendering its order, where the record established that the [c]hild has different available no cost resources to meet her educational needs, each of which enable her to fully participate in her course of study?

DHS's brief, at 4.

■ We review an order requiring a child welfare agency to fund a particular service under an abuse of discretion standard. *See In re J.R.*, 875 A.2d 1111, 1114 (Pa.Super.2005). "An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law." *Id.* (citation omitted).

We have explained:

The juvenile court exercises continuing, independent discretion with regard to the interest of a dependent child. [*In re*] *Tameka M., supra*, 525 Pa. [348], 354, 580 A.2d [750], 753 [ (1990) ]. This authority derives from section 6351 of the Juvenile Act, which grants the court power to issue "orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the [dependent] child." 42 Pa.C.S.A. § 6351(a). In its disposition orders, the court also has the express authority to impose "conditions and limitations." 42 Pa.C.S.A. § 6351(a)(1), (a)(2), (a)(2.1). As explained by our Supreme Court, "in ordering a disposition under Section 6351 of the Juvenile Act, the court acts not in the role of adjudicator reviewing the action of an administrative agency, ... rather the court acts pursuant to a separate discretionary role with the purpose of meeting the child's best interests." *Tameka M., supra*, 525 Pa. at

354, 580 A.2d at 753 (quoting *In re Lowry*, 506 Pa. 121, 127, 484 A.2d 383, 386 (1984)).

In construing the Juvenile Act, both the juvenile courts and the appellate courts must also be guided by a fundamental purpose of the Act, which is "to provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa. C.S.A. § 6301(b)(1.1); *Lowry, supra* at 130–31, 484 A.2d at 388. This purpose imposes on a child welfare agency the legal duty to provide financial support for the care and treatment of a dependent child. *Tameka M., supra*, 525 Pa. at 357, 580 A.2d at 755.

*In re J.R.*, 875 A.2d at 1114–1115.

■ Instantly, DHS's issues on appeal are related. The crux of its argument is that A.T. does not need a laptop computer because alternative computer access exists which is at no cost to DHS. Specifically, in its first issue, DHS argues the juvenile court abused its discretion because

there was no evidence that [A.T.] needs a laptop computer [to] pursue her course of study, or for any other reason. In fact, the testimony was that there were several other resources available to [A.T.] to meet her needs. A laptop computer would simply be for [A.T.]'s convenience.

DHS's brief, at 14. In its second issue, DHS argues the court abused its discretion because it did not consider equally effective alternatives to providing A.T. with her own laptop computer that would be of no financial cost to DHS.

The testimonial evidence from the hearing on March 20, 2013, revealed as follows. Ms. Hargrove, the DHS caseworker, testified that A.T. "is just saying that she is unable to turn in her papers on time and

do the research and she would like to have a laptop actually at her home." N.T., 3/20/13, at 4. Ms. Hargrove testified that A.T. has computer resources available to her at the following locations: (1) four computer labs at CCP; (2) the Achieving Independence Center ("AIC"); (3) the Free Library; and (4) the Valley Youth House. *Id.* at 4–5. Her testimony continued on direct examination:

Q. And on those computers, is [A.T.] able to do the work that she has for school?

A. Yes.

Q. Do you know of any reason that she wouldn't be able to use those?

A. No, [A.T.] said that sometimes they are crowded or she is not able to use them and then she has turned in her papers late, so that is why she would like to have the laptop.

Q. But do you know—as far as her being late, is that her waiting in line for the computer?

A. She didn't say, she just said they are late sometimes.

*Id.* at 5–6. Significantly, Ms. Hargrove testified on cross-examination:

Q. Do you believe that having a laptop computer would be in [A.T.'s] best interests?

A. Yes.

*Id.* at 7. On redirect examination, Ms. Hargrove testified:

Q. As far as the laptop being in [A.T.'s] best interests, she has access to other resources that are equally effective?

A. Yes.

. . .

THE COURT: [to Ms. Hargrove] I know what your position is, you don't want DHS or whoever ordered you to come over and say, We don't want to give her a computer. Your position is, Get her the computer, right?

[Ms. Hargrove]: Correct.

*Id.* at 8.

We conclude the testimonial evidence overwhelmingly supports the juvenile court's finding that it is in A.T.'s best interests to have a laptop computer for her college studies. Indeed, Ms. Hargrove, DHS's own witness, believes it is in A.T.'s best interests to have one. Further, as explained more fully *infra*, we conclude the court did not abuse its discretion despite the testimonial evidence that A.T. has computer access through CCP, AIC, the Free Library, and Valley Youth House.

We review our case law that DHS contends is distinguishable from the instant matter: *In re Tameka M., supra; In re N.E.*, 787 A.2d 1040 (Pa.Super.2001); and *In the Interest of: S.J.*, 906 A.2d 547 (Pa.Super.2006).

In *In re Tameka M.*, our Supreme Court affirmed the order of this Court holding that the trial court had the authority under section 6351 of the Juvenile Act to require the child welfare agency ("agency") to pay for a treatment plan that the court found to be in the child's best interests. Specifically, in that case, the trial court found that the Montessori preschool the foster parents enrolled the child in provided a structured program that was therapeutic as well as educational and was in the child's best interests. The trial court acknowledged the agency's financial limitations and the fact that it would not be reimbursed by the Department of Public Welfare ("DPW") for paying the child's tuition at the Montessori school. Nonetheless, the trial court ordered the agency to reimburse the foster parents for the tuition they had paid to the Montessori school. In affirming this Court's order, the *Tameka M.* Court explained,

. . . [U]nder our law, [the agency] has the duty to give financial support to

dependent children, and Juvenile Court has the duty to act to provide for the "protection and physical, mental and moral welfare" of a dependent child. This bestows on a dependent child the legal right to such care and treatment to be paid for by [the agency]. Were the choice here between two equally effective schools, both suited to the child's special needs, the costs of one of which was reimbursable by DPW and the other not, we would have no hesitancy in holding that it would be an abuse of discretion not to direct that the child be sent to the school the expenses of which were reimbursable. But that was not the choice here. Here, the facts show that the school whose expenses were reimbursable was not adequate while the non-reimbursable Montessori school would provide adequate treatment. It was clearly not error to ignore reimbursability in this situation. The Juvenile Act, as reinforced by our case law, was passed for the *benefit* of dependent children and is based on humanitarian ideals. Once the state intervenes in an individual's life there is the corresponding obligation to provide adequate treatment services to the person affected. *In re Tameka M.*, 525 Pa. at 357–358, 580 A.2d at 755 (emphasis in original).

In *In re N.E., supra*, this Court affirmed the order of the trial court directing the agency to pay a portion of the dependent child's dental bills. We relied on *In re Tameka M., supra*, in holding that N.E., the dependent child, "has the right to have DHS pay for her unreimbursed dental expenses," and, therefore, the trial court did not abuse its discretion.

Likewise, in *In the Interest of: S.J., supra*, this Court relied on *In re Tameka M.*

in affirming the order directing the agency to provide financial assistance to S.J., who was adjudicated dependent when she was sixteen years old, for her college education in the amount of $14.00 per day, pursuant to a policy in Philadelphia "to provide a nominal stipend for college expenses to assist children who have remained in placement from age eighteen to twenty-one years of age."[4] *In the Interest of: S.J.*, 906 A.2d at 549. We quoted the trial court's finding, in part, that

> The added financial assistance may preclude any additional hindrances that could potentially thwart S.J.'s success in pursuing higher education that she otherwise would have had to deal with had she not received the funding. With this additional assistance, S.J. will have the opportunity to evolve into a mature young adult and develop the skills to live independently.

*Id.* at 550.

In *In the Interest of: S.J., supra*, this Court noted,

> the Act establishes that upon turning eighteen years of age a dependent child may, under certain circumstances, remain under the care afforded by the Act until turning twenty-one years of age. Specifically, the Act requires that such a person has been
>
> > adjudicated dependent before reaching the age of 18 years and who, *while engaged in a course of instruction* or treatment, requests the court to retain jurisdiction until the course has been completed, but in no event shall a child remain in a course of instruction or treatment past the age of 21 years.

*Id.* at 550 (citing 42 Pa.C.S.A. § 6302) (emphasis in original). We agreed with the

---

**4.** In that case, the record revealed that DPW would reimburse the agency 80% of its funds spent on the financial assistance for S.J.

trial court that attending college constitutes engagement in a "course of instruction" pursuant to section 6302. This Court then concluded,

> This construction [of the phrase "course of instruction"] dovetails with one of the express purposes of the Act which is "[t]o provide for the care, protection, safety and wholesome mental ... development of children coming within the provisions of this chapter." 42 [Pa. C.S.A.] § 6301(b)(1.1). Without doubt, attendance at college, in pursuit of a bachelor's degree, is an activity that provides for the "wholesome mental development" of a child under the Act. Furthermore, numerous studies have documented the economic benefits of attaining a bachelor's degree.

*Id.* at 551.

DHS argues that *In re Tameka M., supra,* and *In re N.E., supra,* are distinguishable from this case because the evidence supported the trial courts' findings regarding the best interests of the children in those cases. In contrast, DHS argues that the juvenile court's finding in this case is based on speculation, *i.e.,* that a laptop computer is in A.T.'s best interests. With respect to *In the Interest of: S.J., supra,* DHS argues that case is distinguishable based on our conclusion that "in exercising her discretion, the trial judge went to great lengths to balance the financial considerations of this obligation with the appropriate needs of S.J. regarding college." *Id.* at 552. Rather, DHS contends that *In re J.R., supra,* is sufficiently similar as to be controlling in this case. We disagree.

In *In re J.R., supra,* this Court vacated the order directing the agency to provide home telephone service to the father of the dependent child so that he could comply with the agency's requirement that he call the agency to confirm his bi-weekly attendance at the supervised visits. During the permanency review hearing, the agency and the child advocate suggested some alternatives to providing home telephone service for the father, but the trial court did not consider them. Relying on *In re Tameka M., supra,* we held as follows: "In its refusal to consider alternatives, to determine if some alternatives were equally effective, and then to choose the less expensive of equally effective alternatives, the court abused its discretion." [5] *Id.* at 1117. In addition, we held that, "[i]n ordering telephone service that would benefit [the f]ather without a finding that it would serve the dependent child's needs, interests, and welfare, the court committed an error of law." *Id.* at 1118. In short, we concluded:

> ... [A]ll parties agree that consistent, regular visits with [the f]ather are in the best interests of J.R. The goal for J.R. remains reunification with [the f]ather, and regular visits constitute an essential step in meeting that goal. However, we agree with DHS that the evidence of record does not support the inference that home telephone service for Father will ensure his compliance with the visitation schedule and thus promote family reunification and J.R.'s welfare.

*Id.* at 1117.

■ Instantly, DHS argues that the juvenile court abused its discretion pursuant

---

5. We interpreted the reasoning of our Supreme Court, stated as dicta in *In re Tameka, supra,* with respect to when a court is presented with two equally effective alternatives for satisfying a dependent child's need under the Act, as

requir[ing] that a juvenile court consider the alternatives presented to address the needs of a dependent child; then, if two equally effective alternatives are available, the court must choose the one that is less costly to the child welfare agency.
*In re J.R.,* 875 A.2d at 1115.

to *In re J.R., supra,* by failing to consider the no-cost alternatives to providing A.T. with a laptop computer. DHS's argument is without merit. The juvenile court stated as follows in its opinion pursuant to Pa.R.A.P. 1925(a),

> Testimony established [that A.T.] states an inability to submit college course assignments in a timely fashion due to lack of access to computer resources. Furthermore, the testimony stated the possible available resources were overcrowded. Testimony from [A.T.] in the previous hearing [before the master on January 11, 2013] established the extreme need for the computer access.

Trial Court Opinion, 6/4/13, at 3. As such, the court considered the no-cost alternatives and determined they were not equally effective. The court found that the no-cost alternatives placed an undue burden on A.T. *Id.* at 4. Applying the above-described case law to the evidence of record in this case, we discern no abuse of discretion.[6]

Finally, we observe that the juvenile court was aware of DHS's objection to providing a laptop computer based on being a "conscientious steward of the public's money" and wanting to make "an effective use of that money." DHS's brief, at 16. The court stated that it "will not require [DHS] to provide a laptop for every child." Trial Court Opinion, 6/4/13, at 3. Further, the court noted that, although it required DHS to provide a laptop to A.T., it did not require that DHS fund or finance the laptop. The court suggested that DHS may explore resources to possibly obtain a refurbished laptop at no cost.[7] *Id.* We reiterate here the statement by Justice Cappy in his concurring opinion in *In re Tameka M., supra,* that, "[t]his decision should not be taken as a means to allow Juvenile Court Judges to ignore the financial restraints of agencies such as [DHS]; but as only what it is, a decision resting on its own particular facts." *In re Tameka M.,* 525 Pa. at 360, 580 A.2d at 756. Like the court in *In re Tameka M.,* the juvenile court in this case did not abuse its discretion in ordering a service best suited to furthering A.T.'s school work regardless of the financial consequences, if any, to DHS. Accordingly, we affirm the order.

Order affirmed.

---

**6.** DHS also relies on *In re J.R., supra,* in arguing that providing a laptop computer would not alleviate A.T.'s problem in submitting untimely class papers. We disagree. Unlike the testimony in *In re J.R., supra,* in this case the testimonial evidence supports the court's finding that providing A.T. with a laptop computer will help ensure that she submits timely papers and will further her school work in general.

**7.** On direct examination, Ms. Hargrove testified she explored one resource named Teen Children that advertises free computers. She learned that, in order to obtain a computer through Teen Children, A.T. "would have to do two hours volunteer work, she would have to write a letter as to why she cannot afford a computer, and then they wanted a deposit as well as an administrative fee." N.T., 3/20/13, at 5. Ms. Hargrove testified on cross-examination that the deposit and administrative fee "would total about $250." *Id.* at 7.