J-S81011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : : : : : : : : | |
| APPEAL OF: C.R.H., MOTHER | : | No. 1459 MDA 2018 |

Appeal from the Dispositional Order Entered August 23, 2018
In the Court of Common Pleas of Cumberland County
Juvenile Division at No: CP-21-DP-0000062-2017

BEFORE: STABILE, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STABILE, J.:            **FILED JANUARY 25, 2019**

C.R.H. ("Mother") appeals from the dispositional order entered August 23, 2018, in the dependency case involving her daughter, R.H. ("Child"), born in May 2003.[1] After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows, in relevant part.

---

\* Former Justice specially assigned to the Superior Court.

[1] Mother indicates in her notice of appeal and in her brief that she is appealing from the order adjudicating Child dependent, which the trial court entered on August 9, 2018. It is important to note that the final appealable order in this matter is the dispositional order. ***See In re Tameka M.***, 534 A.2d 782, 784 (Pa. Super. 1987), *affirmed*, 580 A.3d 750 (Pa. 1990) ("An appeal cannot be taken from a dependency determination; instead, an aggrieved party must wait until an order of disposition is entered."). Nonetheless, because a final appealable order exists, and because we discern no prejudice stemming from Mother's procedural misstep, we may proceed to review the merits of this appeal.

. . . [Child] has struggled with Anorexia Nervosa since age nine. [Cumberland County Children and Youth Services ("CYS")] has been involved since 2015. Since early 2016, the child has been in and out of hospitals and treatment facilities. The child was previously adjudicated dependent in July 2017 due to her mother's inability to control her behaviors. Dependency was terminated on October 18, 2017, since the child was receiving appropriate treatment in an eating disorder facility.

[Child] is currently a fifteen-year-old juvenile in need of treatment and strict supervision to prevent her health from deteriorating. [Child's] condition is uncontrolled and very severe. At the time of the hearing, the child was inpatient at the Children's Hospital of Philadelphia ("CHOP") and [CYS] sought emergency custody because of hospital staff's concerns that she was at serious physical risk if she left the hospital with her mother. While in Mother's care the child uses drugs (including marijuana, LSD, "Molly" and prescription pills), alcohol, self-harms, and is physically assaultive. The child refuses to follow a dietary plan to keep her weight at a healthy level if not closely supervised. The child is extremely aggressive, frequently requiring medication, physical restraints, and additional clinical and security staff to keep her under control. She is currently under a consent decree for assault against another juvenile, and there have been assaults and attempted assaults against others for which she has not been criminally charged. She has several currently pending serious charges for assaulting various hospital staff. . . .

The child is poorly managed at home. When [Child] is in her [m]other's care, her health deteriorates rapidly and seriously. On several occasions, child has been discharged to her mother's care from treatment in a stable condition, only to return within days in a critical state. Mother is a vocal advocate for [Child]; however, Mother is manipulated easily by the whims and the will of the child. . . .

\*\*\*

Currently, there is great concern with the limited out-of-home placement options available for [Child] due to the nature of her illness and her behaviors. [CYS], the child's probation officer, and the child's doctors have all expressed their beliefs that it is not safe for her to be at home. As a result, [CYS] no longer

- 2 -

believes that R.H. is safe in her [m]other's care, and thus initiated the process to adjudicate R.H. as a dependent child.

Trial Court Opinion, 10/12/18, at 2-5 (footnotes omitted).

The trial court issued a verbal order placing Child in CYS custody on July 15, 2018. CYS filed an application for emergency protective custody on July 16, 2018, which the court granted on July 17, 2018. That same day, CYS filed a shelter care application and dependency petition. The court conducted a shelter care and adjudicatory hearing on August 1, 2018, before entering a shelter care order on August 3, 2018. The court then conducted a continuation of the adjudicatory hearing on August 6, 2018, after which it entered an order adjudicating child dependent on August 9, 2018. Finally, the court conducted a dispositional hearing on August 8, 2018, and entered a dispositional order on August 23, 2018.[2, 3] Mother timely filed a notice of appeal on September 4, 2018, along with a concise statement of errors complained of on appeal.[4]

Mother now raises the following claims for our review.

---

[2] Child's father, G.B., did not appear at the hearings, but court-appointed counsel appeared on his behalf and attempted to represent his interests. CYS was unaware of Father's whereabouts at the time, with Mother reporting, "he's in Chicago in a halfway house and he's on probation. . . . I don't have his phone number." N.T., 8/6/18, at 153.

[3] At the conclusion of each hearing, the trial court dictated an order, which it then entered on the docket. Subsequently, the court entered an additional, more formal order based on its dictated order. Here, we use the order entry dates of the court's more formal orders. We note that Mother's appeal would be timely regardless of what order entry date we used.

[4] Child did not appeal her adjudication of dependency, but she did file a brief in this Court supporting Mother's appeal.

1. Did the Trial Court abuse its discretion and commit an error of law when it found, despite a lack of clear and convincing evidence, that the child is without proper care or control, subsistence, education as required by law, or other care or control necessary for her physical, mental, or emotional health or morals, thus contravening Section 6302(1) of the Juvenile Act, 42 Pa.C.S.A. §6301(1)[?]

2. Did The Trial Court abuse its discretion and commit an error of law when it excluded [Mother] from being present for the testimony of medical professionals who treated her daughter, thereby prejudicing [Mother] and her ability to assist her counsel and violating her Constitutional rights to due process[?]

Mother's Brief at 4 (trial court answers omitted).

In dependency proceedings, we review the trial court's orders pursuant to an abuse of discretion standard of review. *In the Interest of H.K.*, 172 A.3d 71, 74 (Pa. Super. 2017). As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. *Id.* "'An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law.'" *In re A.T.*, 81 A.3d 933, 936 (Pa. Super. 2013) (quoting *In re J.R.*, 875 A.2d 1111, 1114 (Pa. Super. 2005)).

In her first claim on appeal, Mother challenges the trial court's decision to adjudicate Child dependent pursuant to Section 6302(1) of the Juvenile Act. Mother's Brief at 8-12. Mother argues that she provided appropriate care for Child and sought out treatment for her eating disorder. *Id.* She emphasizes that Child was receiving treatment at CHOP at the time the court adjudicated her dependent, and insists that she did not intend to remove Child from CHOP,

characterizing any evidence to the contrary as a mere "miscommunication." *Id.* at 10-12.

The Juvenile Act governs dependency proceedings. *See* 42 Pa.C.S.A. §§ 6301–6375. The Act permits a trial court to adjudicate a child dependent if it finds that he or she meets the requirements of one of ten definitions listed at Section 6302. The Act defines "dependent child" as follows, in relevant part.

> **"Dependent child."** A child who:
>
> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;
>
> ***
>
> (6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent, guardian or other custodian and who is ungovernable and found to be in need of care, treatment or supervision;
>
> ***

42 Pa.C.S.A. § 6302.

At the outset, we note that the trial court adjudicated Child dependent pursuant to both Section 6302(1) and (6). Mother developed a challenge as to Section 6302(1) only in her brief on appeal and preserved a challenge as

to Section 6302(1) only in her concise statement and statement of questions involved. As a result, Mother waived any challenge as to Section 6302(6), and to Child's dependency as a whole. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief. . . . Further, it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

Nevertheless, even accepting for the sake of argument that Mother did preserve a challenge to Child's adjudication of dependency for our review, she still would not be entitled to relief. In its opinion, the trial court found that Child is without proper parental care or control pursuant to Section 6302(1), because Mother is unable to provide her with the discipline, guidance, support, and supervision necessary to maintain a safe and healthy lifestyle. Trial Court Opinion, 10/12/18, at 10. The court reasoned that Mother is unable to control Child's substance abuse and violent behaviors. *Id.* It further reasoned that Child's eating disorder worsens rapidly whenever she is in Mother's care. *Id.* at 10-11. Regarding Section 6302(6), the court found that Child is habitually disobedient, ungovernable, and in need of treatment and supervision, as she engages in substance abuse and violent behaviors, and refuses to eat despite Mother's direction that she consume a heathy diet. *Id.* at 12.

Our review of the record supports the trial court's findings. Throughout the hearings, the court heard copious testimony concerning Child's substance abuse and violent behaviors. Child's juvenile probation officer, Justin Pittman, testified that Child "mostly" tests positive for marijuana, but that she has also tested positive for alcohol, and admitted to "abusing some pills, prescriptions, and . . . using LSD in the past." N.T., 8/1/18, at 72. He explained that Child's probation resulted from a misdemeanor simple assault charge in May 2017, and that she is currently facing an additional six charges of felony aggravated assault due to one or more incidents at Hershey Medical Center. *Id.* at 65-66. Jennifer Chuang, M.D., testified that Child continued to behave violently after arriving at CHOP. *Id.* at 40. She described the following incident.

> . . . . This is from July 25th where in the early afternoon, about 1:30, [Child] became very verbally agitated. She did require being in restrain[t]s at that time due to her aggression towards the staff. Later that afternoon, I had rounded on her. We had spoken about an inter-agency phone call that we had regarding a recommendation of care. In particular, she was accepted to assisted living, and we were still waiting [for] insurance approval. [Child] was very, she was pretty insistent that she said that she did not want to go, and she became more and more upset and was spitting on staff. She punched a nurse. She head-butted another nurse, and during her escalations, she also had shouted to everybody in the room, ["]I am going to f-ing kill you all.["] So that was just one of the episodes last week. But last week she -- this did occur on a nearly daily basis.

*Id.* at 41-42.[5]

---

[5] Dr. Chuang noted that Child's behaviors have been "much better" during the "last several days[.]" N.T., 8/1/18, at 40.

The trial court also heard testimony concerning Mother's inability to care for Child and manage her eating disorder. The record confirms that Child's condition deteriorates quickly whenever she leaves the hospital and returns to Mother's care. Rebecka Peebles, M.D., testified that CHOP has discharged Child "at least two times earlier than we would have preferred at mom's strong request slash insistence, and she has multiple episodes of becoming ill within 3 days of being home." N.T., 8/6/18, at 41. She explained as follows.

> . . . . [M]om has assured us that she has a safe plan of care for once [Child] gets home.
>
> And within literally 3 to 7 days [Child] has been back in an emergency room setting with either an overdose, or alcohol intoxication, or hypokalemia that is life threatening, meaning low potassium value because she's been vomiting so much that she is now dangerously close to having a life[-]threatening arrhythmia of her heart, or due to significant weight loss and her heart muscle getting tired and beating too slowly and having that be incredibly dangerous.
>
> So she has gotten dangerously ill after many discharges and all of her most recent discharges, and as a result we no longer feel that it is safe for her to go home from CHOP. . . .

*Id.* at 30-31.

Moreover, the trial court heard testimony that Mother refuses or fails to make appropriate treatment decisions for Child. Dr. Peebles testified that Child would soon be transferring from CHOP to an inpatient facility in Virginia. She explained that the facility "could be really, really good" for Child and that it was the only one out of twenty-seven such facilities that agreed to admit her. *Id.* at 32, 49, 55. Dr. Peebles reported that Mother had initially opposed

- 8 -

the transfer. *Id.* at 49. Mother "would hang up the phone on me and tell me she was going to sue us and that she would not accept it." *Id.* Dr. Peebles observed that Mother agreed to the transfer only after CYS commenced dependency proceedings. *Id.* at 62. During her testimony, Mother criticized the idea of transferring Child to the facility harshly, arguing that inpatient treatment only worsens Child's condition, and that she should attend intensive outpatient treatment instead. N.T., 8/1/18, at 103-06. However, Dr. Peebles rejected Mother's position, explaining that no responsible outpatient program would even accept Child, and that she is "unqualified for outpatient care by any metric, medical or psychiatric." N.T., 8/6/18, at 43-46.

The record reveals that Mother displayed similar hostility toward Child's treatment at CHOP. Kenisha Campbell, M.D., testified that Mother considered discharging Child from CHOP against medical advice. N.T., 8/1/18, at 85. Dr. Campbell described a phone conversation during which Mother asked what would happen if she tried to discharge Child. *Id.* at 83. Dr. Campbell replied that Child was not safe to go home, and that she would have to contact social workers and Child's probation officer in an effort to prevent the discharge. *Id.* at 83-84. Mother responded "that her lawyer told her that we couldn't hold her daughter in the hospital, and that we were holding her in prison . . . . And then mom basically said, well, I am coming up there later[.]" *Id.* at 84. This conversation led Dr. Campbell to believe that Mother may try to discharge Child later that day, which in turn led CHOP to contact CYS. *Id.* at 85.

Thus, the record confirms that Child lacks proper parental care or control pursuant to Section 6302(1). Mother has demonstrated that she is incapable of ensuring Child's safety and well-being. She has failed to provide Child with appropriate supervision regarding her substance abuse, violent behaviors, and eating disorder. Further, she has refused or failed to make suitable treatment decisions for Child absent intervention by the trial court and CYS. Mother displayed hostility toward inpatient treatment for Child despite the obvious severity of her condition and the recommendations of her doctors at CHOP. Mother even considered attempting to discharge Child from CHOP against medical advice.

In addition, while the record is somewhat unclear as to the extent of Mother's efforts to manage Child's behaviors at home, it is apparent that Child displays habitual disobedience and is both ungovernable and in need of care, treatment, and supervision pursuant to Section 6302(6). During the hearing, Mother testified that she takes steps to address Child's eating disorder such as purchasing locks so that Child "can't binge on the food" and portioning out Child's food "so she won't want to throw up." *Id.* at 94. Nonetheless, Mother seemed resigned to the futility of her efforts, noting that it "is not something that anybody can control besides her." *Id.* at 95. Similarly, Dr. Peebles testified that the staff at CHOP has attempted to educate Mother about the type of support that she would need to provide for Child at home, but that Mother "gets very defensive, and she says, [']I know how to watch her. You

can't make her do anything she doesn't want to do, you know.[']" N.T., 8/6/18, at 64. We conclude that the trial court did not commit an error of law or abuse its discretion by adjudicating Child dependent.

In her second claim, Mother assails the trial court's decision to prevent her from being present during the testimony of Dr. Peebles. Mother's Brief at 8, 13-16. By way of background, Dr. Peebles and counsel for CHOP requested that Mother and Child not be present during the testimony due to concerns that they may attempt to retaliate and harm Dr. Peebles. N.T., 8/6/18, at 10-20. The court granted the request, but permitted counsel for both Mother and Child to be present, conduct cross-examination, and inform their clients of the substance of the testimony. *Id.* at 21-22. Mother maintains that the court's decision prejudiced her and violated her right to due process. Mother's Brief at 8, 13-16. She acknowledges that the court had the power to exclude her based upon a showing of good cause, but insists that no good cause existed in this case. *Id.* at 15-16.

It is beyond cavil that a parent maintains a right to due process in any dependency proceeding involving his or her child. *See, e.g., In the Interest of Jones*, 429 A.2d 671 (Pa. Super. 1981). That right includes the ability to confront and cross-examine adverse witnesses. *Id.* at 675. However, the parent's right to due process is not without limitations. *See S.T. v. R.W.*, 192 A.3d 1155, 1161 (Pa. Super. 2018) (quoting *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996)) ("'Due process is flexible and calls

for such procedural protections as the situation demands.'"). The Rules of Juvenile Court Procedure provide as follows, in relevant part.

> **A. General Rule.** All parties shall be present at any proceeding unless the exceptions of paragraph (B) apply.
>
> **B. Exceptions.**
>
> (1) *Absence from proceedings*. The court may proceed in the absence of a party upon good cause shown except that in no case shall a hearing occur in the absence of a child's attorney. If a child has a guardian *ad litem* and legal counsel, both attorneys shall be present.
>
> (2) *Exclusion from proceedings*. A party may be excluded from a proceeding only for good cause shown. If a party is so excluded, counsel for the party shall be permitted to be present.

Pa.R.J.C.P. 1128(A)-(B).

In the instant matter, the trial court explained that it prevented Mother from being present during the testimony of Dr. Peebles due to the doctor's credible concern for her own safety. Trial Court Opinion, 10/12/18, at 15-16. The court reasoned that it was imperative for it to hear testimony from Dr. Peebles and that its decision did not cause Mother undue prejudice. *Id.* at 15. The court further reasoned that it protected Mother's due process right by allowing her counsel to be present, conduct cross-examination, and inform her of the substance of the testimony. *Id.*

We conclude once again that Mother is not entitled to relief. Prior to testifying, Dr. Peebles explained her concern that Mother may attempt to harm her if she is present during the testimony. Dr. Peebles acknowledged that she was not aware of Mother ever threatening to harm someone, but emphasized

that Mother "has never expressed any remorse or concern or even worry for a single staff member, including myself, when we are dealing with her daughter who becomes violent on a regular basis." N.T., 8/6/18, at 12. Dr. Peebles characterized Mother's apathy as "highly unusual" and noted that Mother "certainly does not" discourage Child's acts of violence. *Id.* at 12-13, 16-17. In fact, Dr. Peebles observed that most of Child's violent behaviors occurred during or after a phone call with Mother and that Mother seemingly "inflames [Child] and is in favor of [Child] showing her anger to staff." *Id.* at 16-17. Dr. Peebles reported that Child's violent behaviors ceased after CHOP limited Mother's communication with her and that it "seems directly correlated to her communication with mom." *Id.* at 19.

Accordingly, while we agree with Mother that the record lacks evidence that she would harm Dr. Peebles personally, the record does support the possibility that Mother would incite or encourage further violent behavior by Child against the staff at CHOP in general, or against Dr. Peebles in particular. It was within the trial court's discretion to accept the testimony of Dr. Peebles and deem her concerns credible. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017) ("The [trial c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."). Thus, we conclude that good cause existed to exclude Mother pursuant to Rule 1128(B)(2).

Based on the foregoing, we conclude that the trial court did not abuse its discretion or commit an error of law by adjudicating Child dependent. We therefore affirm the court's August 23, 2018 dispositional order.

Order affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/25/2019