J-S83043-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P.G., NATURAL MOTHER | : | No. 1171 WDA 2018 |

Appeal from the Order Entered August 2, 2018
in the Court of Common Pleas of Blair County
Juvenile Division at No(s): CP-07-DP-0000081-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: E.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P.G., NATURAL MOTHER | : | No. 1172 WDA 2018 |

Appeal from the Order Entered August 2, 2018
in the Court of Common Pleas of Blair County
Juvenile Division at No(s): CP-07-DP-0000080-2013

BEFORE: PANELLA, J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED FEBRUARY 28, 2019**

J.P.G. ("Mother") appeals from the Orders entered August 2, 2018,[1]

which set the initial permanent placement goal of her daughter, E.S.P. (born

in July 2004), as adoption, and changed the permanent placement goal of her

---

[1] Although the Notice of Appeal lists the Permanency Review Orders as entered on July 19, 2018, the certified docket reflects that the Orders were filed on August 2, 2018. The caption has been amended accordingly.

daughter, E.E.P. (born in October 2005) (collectively, "the Children"), from reunification to adoption.[2]  We affirm.

Blair County Children, Youth and Families ("CYF") first became involved with Mother and the Children in 2011.  In 2013, Mother was charged with five counts of endangering the welfare of children, because of deplorable conditions in the family's home.[3]  CYF filed dependency Petitions for the Children, but withdrew them just over a week later.  It appears that CYF withdrew its Petitions because A.P. ("Maternal Grandmother") had obtained custody of the Children.  Although the circumstances are not entirely clear from the record, the Children and their siblings later disclosed abusive conduct by Mother.  Mother was indicated as a perpetrator of abuse, in May 2015, for unreasonably restraining/confining the Children's sister.  In 2016, Mother was indicated as a perpetrator of abuse for the sexual exploitation of the same sibling.

On December 7, 2016, CYF filed an Application for the emergency protective custody of E.E.P., along with a Shelter Care Application.  CYF averred that Maternal Grandmother had contacted CYF and requested the removal of E.E.P., because she could no longer handle the child's behaviors. CYF further averred that the juvenile court granted verbal emergency

---

[2] The Children's father, J.P., Sr. ("Father"), did not appeal, nor has he filed a brief in connection with Mother's appeal.

[3] The charges were later dismissed.

protective custody of E.E.P. earlier that day. The court entered an Order for emergency protective custody on December 7, 2016, followed by a Shelter Care Order on December 15, 2016. The record reflects that Mother was not having contact with either of the Children at that time, due to a September 22, 2016 child custody Order, which found that any contact would be harmful to the Children.

CYF filed a dependency Petition, with respect to E.E.P., on December 12, 2016, and on December 28, 2016, the juvenile court adjudicated her dependent. The juvenile court set E.E.P.'s permanent placement goal as "return to the home of her [M]aternal [G]randmother, with a concurrent goal of adoption." Order of Adjudication and Disposition, 12/28/16, at 5. The court further Ordered that the Custody Order prohibiting contact between E.E.P. and Mother would remain in effect.

On February 24, 2017, CYF filed an Application for protective custody, along with a Shelter Care Application, with respect to E.S.P. CYF averred that E.S.P. had been staying in therapeutic foster care and at a teen shelter, and that Maternal Grandmother was unwilling to accept E.S.P. back into her home. Maternal Grandmother claimed that E.S.P. had assaulted her, and that Maternal Grandmother and her family were living in fear of E.S.P. CYF further averred that the juvenile court granted verbal emergency protective custody of E.S.P. that same day. The court entered an Order for emergency protective

custody on February 24, 2017, followed by a Shelter Care Order on March 3, 2017.

CYF filed a dependency Petition, with respect to E.S.P., on March 1, 2017, and on March 10, 2017, Maternal Grandmother filed a Motion for Interim Hearing. In that Motion, Maternal Grandmother averred that she could no longer serve as a permanent placement option for E.E.P., and requested that the juvenile court change E.E.P.'s permanent placement goal to adoption. The court entered a permanency review Order on July 3, 2017, in which it maintained E.E.P.'s goal as returning to Maternal Grandmother's home, pending completion of global psychological evaluations of the Children and Mother, among others. The court entered a separate Order adjudicating E.S.P. dependent. The court deferred its decision as to E.S.P.'s permanent placement goal and directed that contact between E.S.P. and Mother would remain suspended, also pending completion of the evaluations.

On January 3, 2018, after receiving the results of the evaluations, CYF filed Motions for permanency/dispositional review hearings, recommending that adoption become the new permanent placement goal for both Children. The court held hearings on January 24, 2018, and April 18, 2018. Subsequently, by an Order entered on August 2, 2018, the court changed E.E.P.'s goal to adoption. By a separate Order entered that same day, the

court set E.S.P.'s initial goal as adoption.[4]  Mother timely filed Notices of

Appeal on August 17, 2018, along with Concise Statements of errors

complained of on appeal.

Mother now raises the following claims for our review:

A. Whether or not the [juvenile] court erred in finding that reasonable efforts were made by [CYF] and the directives of the prior [O]rder were followed by [CYF]?

B. Whether or not the [juvenile] court erred in not directing [that] [M]other be afforded visitation prior to any goal change?

C. Whether or not the [juvenile] court erred in not interviewing each child in person?

D. Whether or not the [juvenile] court erred in finding [that CYF had] satisfied the requirements relative to [the] family finding and that [the] family finding be discontinued or limited?

E. Whether or not the [juvenile] court erred in changing the goal from return home or deferred to adoption?

Mother's Brief at 4 (suggested answers and unnecessary capitalization

omitted).

In dependency appeals, we review the juvenile court's orders pursuant

to an abuse of discretion standard of review.  ***In the Interest of H.K.***, 172

---

[4] In its Opinion, the juvenile court indicates that it "conducted the latest Permanency Review Hearings on October 26, 2017, January 25, [*sic*] 2018, April 18, 2018, and July 19, 2018.  At the July 19, 2018 Hearing, the Goal was changed to Adoption."  Juvenile Court Opinion, 10/5/18, at 10.  We observe that the court dated its goal change Orders July 19, 2018, although the docket does not indicate that the court entered the Orders until August 2, 2018, and that the most recent permanency review hearing actually occurred on July 23, 2018.  During the hearing on July 23, 2018, the court indicated that it would be issuing its goal change Orders later that day.  N.T., 7/23/18, at 11.

A.3d 71, 74 (Pa. Super. 2017). As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. *Id.* "An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law." *In re A.T.*, 81 A.3d 933, 936 (Pa. Super. 2013) (citation omitted).

In her first claim, Mother argues that the juvenile court erred in finding that CYF had provided her with reasonable reunification efforts. Mother's Brief at 11-22. Mother asserts that she did not receive visits with the Children, and that CYF did not inspect her home. *Id.* at 12-14, 16-22.

The requirement that a county agency provide reasonable reunification efforts is a product of federal law. Specifically, the federal Adoption and Safe Families Act requires that each state adopt a plan for its foster care system, directing that reasonable efforts "shall be made to preserve and reunify families[.]" 42 U.S.C.A. § 671(a)(15)(B). However, there are exceptions to this requirement. *See In re D.C.D.*, 105 A.3d 662, 675-76 (Pa. Super. 2014). Of particular relevance to this appeal, the federal statute provides that a county agency need not provide reasonable efforts if those efforts would be inconsistent with the child's permanency plan. 42 U.S.C.A. § 671(a)(15)(C).

The language of the Pennsylvania Juvenile Act, and our Rules of Juvenile Court Procedure, incorporate the exceptions contained within the Adoption and Safe Families Act. For example, both require that juvenile courts must

make a series of factual findings at each permanency review hearing, including assessing, *inter alia*, whether "reasonable efforts were made to finalize the permanency plan in effect."  42 Pa.C.S.A. § 6351(f)(5.1); Pa.R.J.C.P. 1608(D)(1)(e).

Here, the record belies Mother's characterization of the juvenile court's August 2, 2018 Orders.  Neither of the Orders indicated that CYF had provided Mother with reasonable reunification efforts.  Instead, the Orders addressed whether CYF provided reasonable efforts to Maternal Grandmother, indicating that such efforts were "not applicable, in that neither [the Children,] nor Guardian wish reunification."  Permanency Review Order (E.S.P.), 8/2/18, at 2 (emphasis omitted); Permanency Review Order (E.E.P.), 8/2/18, at 2 (emphasis omitted).  Further, pursuant to the statutory authority discussed above, it is apparent that CYF was under no obligation to provide reasonable efforts to Mother.  Reasonable efforts would not have been consistent with either of the Children's permanency plans.

Prior to the goal change, E.E.P.'s permanent placement goal was reunification with Maternal Grandmother.  The court deferred its decision as to E.S.P.'s permanent placement goal pending the outcome of the global psychological evaluations.  To the extent E.S.P. had a goal, the court and the parties appeared to act as though her goal was no different than E.E.P.'s goal.  Indeed, the record reveals that the court and the parties sometimes stated, mistakenly, that E.S.P.'s goal was also to achieve reunification with Maternal

- 7 -

Grandmother. ***See, e.g.,*** Motion for 18 Month Permanency/Dispositional Review Hearing (Summary & Recommendations), 7/2/18 (listing E.S.P.'s goal as "Return to guardian"). Thus, Mother is not entitled to relief.

In her second claim, Mother contends that the juvenile court erred by failing to direct that visits occur between her and the Children. ***See*** Mother's Brief at 23-41. Mother argues that the Children were receptive to visits previously, and that the court ordered that visits could occur if therapeutically appropriate.[5] ***Id.*** at 24-26. While Mother concedes that the Children later changed their positions, indicating that they did not want visits, she proposes that they "have been tainted by the guardian and the oldest child against her[.]"[6] ***Id.*** at 26-37. She further asserts that E.E.P.'s therapist "literally sabotaged" Mother's efforts to achieve contact. ***Id.*** at 37-41.

"In dependency cases such as this, the standard against which visitation is measured also depends upon the goal mandated in the family service plan." ***In re C.J.***, 729 A.2d 89, 95 (Pa. Super. 1999). When reunification remains the goal of the family service plan, "visitation will not be denied or reduced unless it poses a grave threat. If, however, the goal is no longer reunification

---

[5] More accurately, E.E.P. requested visits with Mother and E.S.P. stated that she would tolerate visits if they were supervised. N.T., 6/7/17, at 3, 18.

[6] We interpret this as a reference to Maternal Grandmother and to one of the Children's siblings, who also resided with Maternal Grandmother but is not a subject of this appeal.

of the family, then visitation may be limited or denied if it is in the best interests of the child or children." *Id.* (citations omitted).

The instant case presents an unusual factual situation. As explained above, E.E.P.'s permanent placement goal, prior to the juvenile court's entry of the Orders on appeal, was to return to the home of Maternal Grandmother. While E.S.P. did not have a permanent placement goal until the court entered its Orders, the court and the parties appeared to act as though her goal was also to return to Maternal Grandmother's home. Accordingly, to the extent reunification was the goal of the family service plan for both Children, as described in *C.J.*, the goal was reunification with Maternal Grandmother, and not Mother. Therefore, we conclude that it would have been inappropriate for the court to apply the stricter, grave threat standard, when discerning whether to deny Mother's requests for visitation, and that the more permissive, best interest standard, controlled.

However, even applying the stricter grave threat standard, the record would support the juvenile court's decision to deny Mother visitation. The court heard extensive evidence throughout these proceedings concerning the emotional harm that could befall the Children if it were to subject them to further contact with Mother. Regarding E.E.P., the court heard testimony from her therapist, Alison Seltzer ("Ms. Seltzer"). Ms. Seltzer reported that E.E.P. no longer wanted contact with Mother, and that she had maintained that position since August 2017. N.T., 1/24/18, at 80-82. Ms. Seltzer cautioned

that any such contact "would be counterproductive and behaviorally detrimental to her psychological well-being and setting [E.E.P.] up for psychological damage if this were to occur." *Id.* at 83.

In addition, with respect to E.S.P., the juvenile court heard testimony from her therapist, Andrew Kremenik ("Mr. Kremenik"). Mr. Kremenik reported that E.S.P. also did not want contact with Mother. *Id.* at 111. He explained that E.S.P. "says this on a weekly and daily basis. She wants absolutely no contact…. She says it every week when we are in sessions, and she reiterates it to me to make sure that I continue to pass that along to her entire treatment team." *Id.* Mr. Kremenik further opined that contact with Mother would not benefit E.S.P. therapeutically, but instead would "set her back[.]" *Id.* at 112. He explained that merely talking about her past causes E.S.P. to become "visibly upset … with the rate, the tone of her volume, with her non-verbals and, you know, her fist and body shake." *Id.* at 110. Given this evidence, we discern no abuse of discretion or error of law.

In her third claim, Mother argues that the juvenile court erred by failing to interview the Children in person. *See* Mother's Brief at 42-45. While she acknowledges that the court interviewed the Children in person in June 2017, Mother maintains that the court should have interviewed them again during the subsequent review period. *Id.* In support of this position, she relies on Pennsylvania Rule of Juvenile Court Procedure 1128. *Id.* at 44.

Rule 1128 provides, in relevant part, that a juvenile court may conduct a proceeding in the absence of a party only upon good cause shown. Pa.R.J.C.P. 1128(B)(1). However, the rule also provides that a court may never proceed in the absence of the child's legal representative. *Id.* The comment to the Rule provides, in relevant part, as follows:

> Ensuring a child appears in court on a regular basis is critical because the court oversees the child and is to ensure his or her care, protection, safety, and wholesome mental and physical development. However, the court may ask that the child be removed from the courtroom during sensitive testimony.

Pa.R.J.C.P. 1128, Comment.

Upon review, we conclude that Mother is not entitled to relief. Rule 1128 and its comment indicate merely that the juvenile court may not conduct a dependency proceeding in the absence of the subject child without a showing of good cause. *See id.* The rule does not provide that the court must always interview the child as Mother suggests. In addition, we observe that while the Juvenile Act directs that the court "shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal," during each permanency review hearing, the language of the Act provides expressly for situations where the court does not consult with the child. 42 Pa.C.S.A. § 6351(e)(1). The Act instructs that, if the court "does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian *ad litem*[.]" *Id.*; *see*

- 11 -

*also* 42 Pa.C.S.A. § 6311(b)(9); Pa.R.J.C.P. 1154(9) (providing that a child's guardian *ad litem* must "[a]dvise the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes."). In the instant matter, the Children's guardian *ad litem*, Christian A. Kerstetter, Esquire ("Attorney Kerstetter"), satisfied these requirements by reporting, on April 18, 2018, that he had spoken with the Children and that adoption was their preferred outcome. N.T., 4/18/18, at 104.

Further, we observe that on January 9, 2018, Attorney Kerstetter filed Motions to excuse the Children from attending the start of the goal change hearing scheduled for January 24, 2018. Attorney Kerstetter averred that the Children did not want to have contact with Mother, that contact would be harmful to the Children, and that it would be difficult to avoid contact if the Children attended the hearing. He further averred that requiring the Children to attend the hearing would require E.S.P. to spend six or more hours in transit to and from her treatment facility and would disrupt E.E.P.'s school day. The court granted the Motions by Orders entered January 12, 2018.[7] When the court and the parties reconvened for the conclusion of the hearing on April 18, 2018, the Children were absent once again. Attorney Kerstetter explained,

---

[7] The Children's previous guardian *ad litem*, Gary A. Caldwell, Esquire, filed similar Motions requesting that the juvenile court excuse the Children from appearing at the hearing scheduled for October 26, 2017. The court granted the Motions by Orders entered October 24, 2017.

- 12 -

"before the last hearing I had filed a motion to have them excused … and because this is a continuation of that hearing, I treated it like that Order was still in effect[,] and like I said[,] I never received an objection or request otherwise." N.T., 4/18/18, at 14. Given the averments contained within Attorney Kerstetter's Motions, it was proper for the court to excuse the Children from attending the goal change proceedings.

In Mother's fourth claim, she contends that the juvenile court erred by concluding that CYF satisfied its obligations with respect to "family finding."[8] *See* Mother's Brief at 46-47. Mother observes that the Children do not live with family or with each other. *Id.* at 46. Mother also asserts that the subject Orders discontinued family finding as to E.E.P., and "directed the Family Finding to the individual who could not obtain an Interstate Compact Homestudy" as to E.S.P. *Id.*

The Rules of Juvenile Court Procedure provide that juvenile courts must determine "whether the county agency has satisfied the requirements of Rule

---

[8] The term "family finding" is defined as follows:

> The ongoing diligent efforts of the county agency, or its contracted providers, to search for and identify adult relatives and kin, and engage them in the county agency's social service planning and delivery of services, including gaining commitment from relatives and kin to support a child or guardian receiving county agency services.

Pa.R.J.C.P. 1120.

1149 regarding family finding, and if not, … why the requirements have not been met by the county agency" during each permanency review hearing. Pa.R.J.C.P. 1608(D)(1)(h). The Rules further provide that any permanency review order must indicate whether the family finding efforts made by the county agency were reasonable. Pa.R.J.C.P. 1609(D)(1). If the family finding efforts were not reasonable, the court must order the county agency to engage in family finding prior to the next permanency review hearing. Pa.R.J.C.P. 1609(D)(2).

Rule 1149 imposes the following requirements with regard to family finding.

**A. Court's inquiry and determination.**

(1) The court shall inquire as to the efforts made by the county agency to comply with the family finding requirements pursuant to 62 P.S. § 1301 *et seq.*

(2) The court shall place its determinations on the record as to whether the county agency has reasonably engaged in family finding.

**B. Discontinued family finding.** Family finding may be discontinued only if, after a hearing, the court has made a specific determination that:

(1) continued family finding no longer serves the best interests of the child;

(2) continued family finding is a threat to the child's safety; or

(3) the child is in a preadoptive placement and the court proceedings to adopt the child have been commenced pursuant to 23 Pa.C.S.[A.] Part III (relating to adoption).

> **C. Resuming family finding.** The county agency shall resume family finding when the court determines that resuming family finding:
>
> > (1) is best suited to the safety, protection and physical, mental, and moral welfare of the child; and
> >
> > (2) does not pose a threat to the child's safety.

Pa.R.J.C.P. 1149.

Here, the record reveals that CYF made efforts to locate possible family placements for E.E.P., but had little initial success. *See* Motion for 15 Month Permanency/Dispositional Review Hearing (Summary & Recommendations), 1/3/18 (explaining that CYF sent letters to known relatives of E.E.P. and also spoke to Maternal Grandmother, who was "unable to name any relatives as possible resource options.").[9] The juvenile court discontinued family finding as to E.E.P., in its August 2, 2018 Order, after her foster parents expressed interest in becoming adoptive resources and E.E.P. agreed that she would like her foster parents to adopt her. Under the circumstances, it was well within the court's discretion to discontinue family finding, in accordance with E.E.P.'s best interests, pursuant to Rule 1149(B)(1).

With respect to E.S.P., it is difficult to ascertain Mother's complaint. In the subject Order, the juvenile court directed that further family finding occur

---

[9] At the start of the hearing on January 24, 2018, counsel stipulated that the CYF caseworker would testify consistent with the facts alleged in the "12-month permanency review" Motion. N.T., 1/24/18, at 2-3. As noted above, CYF actually filed two such Motions on the same day: a twelve-month review Motion for E.S.P., and a fifteen-month review Motion for E.E.P.

with respect to a relative in Tennessee who had expressed interest in becoming a placement resource. While CYF and the relative were having a difficult time obtaining a home study, so that the placement could occur in compliance with the Interstate Compact on the Placement of Children ("ICPC"), it is apparent from the record that this was not CYF's, or the relative's, fault. Caseworker Tawnya Plunkard testified that she "contacted the Tennessee ICPC in August of 2017; I submitted all the required paperwork; mid[-]September I heard[,] …Tennessee was considering [E.S.P.] to be a Level II care, and because of that Tennessee ICPC would not complete their home study given that [E.S.P.] would require additional services." N.T., 4/18/18, at 18. She confirmed, however, that CYF would continue to pursue a home study through a private provider.[10] *Id.* at 19-22. We can see no basis upon which to disturb the court's Order.

In her fifth and final claim, Mother argues that the juvenile court erred by setting the Children's permanent placement goals as adoption. *See* Mother's Brief at 48-49. Mother relies primarily on the arguments contained in her preceding four issues, and additionally insists that she has made progress toward alleviating the circumstances requiring the Children's placement in foster care. *Id.*

---

[10] The juvenile court entered a permanency review Order on September 13, 2018, directing that CYF continue family finding for E.S.P. without reference to the relative in Tennessee.

Juvenile courts apply the following analysis when considering whether to change a child's permanent placement goal.

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court….

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations omitted).

Once again, we discern no abuse of discretion or error of law by the juvenile court. The court heard testimony from psychologist, Terry O'Hara, Ph.D. ("Dr. O'Hara"), who evaluated Mother and the Children. Dr. O'Hara testified that he reviewed collateral information setting forth "extensive allegations of detailed physical abuse, exposure to sexual inappropriateness, exposure to inappropriate caregivers, domestic violence, a chaotic household situation, [and] neglect as well." N.T., 1/24/18, at 12. The Children also described this abuse to Dr. O'Hara during their evaluations, providing "very concrete disturbing allegations of what it was like when they resided with their parents." *Id.* at 18. Dr. O'Hara summarized E.S.P.'s allegations as follows:

[E.S.P.] told me things like she has been alone her whole life, not feeling wanted. She alleged abuse and neglect. That she was shook and struck by her parents. Placed in a chair position for

- 17 -

five minutes. That was detailed in my report that many of the children had to sit in a chair-like position I believe against the wall for several minutes at a time.

*\*\**

… I think some of the allegations that she's made about [] [F]ather are concerning because from the [C]hildren's perspective[,] [Mother] was present and not protecting them, but I think certainly most of the abuse was alleged by [] [F]ather, but [E.S.P.] disclosed both parents as being abusive. She also spoke about rats and bugs and roaches in the cupboards. That there was domestic violence in the household. That [Mother] had welts on her face from [Father.] That most [*sic*] [Mother] would quote be in a corner crying when my dad beat us up, and she got beat up by him first, close quote. She alleged that [Mother's current husband, T.G.,] locked her in a closet for hours and that she was whipped with metal spatulas by him, and that her mother was quote always out with boyfriends. She seemed to prioritize boyfriends by [E.S.P.'s] perspective[,] and permitted the boyfriends to, quote, beat us, close quote….

*Id.* at 33-34.

Dr. O'Hara further observed that Mother exhibits major depressive disorder and generalized anxiety disorder. *Id.* at 13. Further, Mother's mental health records indicated that she had not been consistent in receiving treatment for those conditions. *Id.* Dr. O'Hara expressed particular concern that the records "noted her to not take any responsibility for her circumstances as well which was a theme in my evaluation of her where she essentially externalized or minimized virtually all the allegations involving her[.]" *Id.* at 14. He explained that Mother's externalization of responsibility was troubling because it indicated that she had "no substantive desire or motivation to make any changes. So I didn't have any evidence that she was in a position that

she was wanting to make any changes with respect to the factors that influence the [C]hildren to be removed." ***Id.***

In addition to his concerns regarding Mother, Dr. O'Hara cautioned that T.G., whom he also evaluated, and with whom Mother resides, exhibits his own severe mental health problems. Dr. O'Hara detailed the information he learned by reviewing T.G.'s mental health records, as follows:

> [I]n those records he was diagnosed with Bipolar I disorder, severe with psychosis. Bipolar I would refer to mania as opposed to hypomania. There has to be a manic episode…. [A] manic episode would last for at least one week where there's elevations in mood. One feels grandiosity. There's a lot of impulsivity. There's risky decision-making.

> ***

> Then there was a psychotic element in the Bipolar Disorder II[,] which would mean that during these times of elevation and mood and energy level for [T.G.] he is also having delusions. He was also diagnosed with Intermittent Explosive Disorder. That is someone who has just a lot of anger management issues, not able to control one's temper, flies off the handle…. He is also diagnosed with panic disorder which would mean five to ten minutes of intense anxiety where one feels like one is going to pass out or have a heart attack…. He had reported to them attempting suicide on two occasions in 2013[,] which is revelatory of a real lack of coping skills and managing and regulating his presentation. They also reference psychiatric hospitalization for [T.G.], significant anger, a diagnosis of schizophrenia historically as well which would refer to hallucinations and delusions. It can also refer to a lot of disorganization in one's presentation…. There were indications of poor hygiene by his clinicians which would speak to schizophrenia. We often see poor hygiene as one of the symptoms of schizophrenia that one is so preoccupied with hallucinations and delusions it's really hard for one to just take care of one's basic needs. He had talked about psychosis being so included in his psychotic episodes where he would have hallucinations or delusions…. He reported that a radio was in the back of his head. There was also an indication in the record that he was placing girls'

- 19 -

bras and panties in a freezer and that this had apparently happened at his university or college and he was on some sort of monitoring as a result of that. So these records were reflective of significant substantial mental health issues without any evidence of them being sufficiently addressed. Also revelatory of extremely poor coping skills, anger management issues, and really no evidence that [T.G.] is making any steps to try to remedy these concerns.

*Id.* at 25-28.

Based on this evidence, and based on the evidence discussed earlier in this Memorandum, *i.e.*, that the Children do not want contact with Mother, and that contact with Mother will harm the Children, we discern no abuse of discretion or error of law by the juvenile court. The Children have not lived with Mother since 2013, and they are in need of a permanent and stable home. Moreover, the record confirms that Mother will not be able to provide the Children with that home within a reasonable time. As this Court has emphasized in the context of termination of parental rights proceedings, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Therefore, we affirm the juvenile court's August 2, 2018 Orders setting E.S.P.'s initial permanent placement goal as adoption, and changing E.E.P's permanent placement goal from reunification to adoption.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/2019