J-A29041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 944 WDA 2019 |

Appeal from the Order Dated May 28, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-000117-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: H.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.C., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 945 WDA 2019 |

Appeal from the Order Dated May 28, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-000119-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.C., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 946 WDA 2019 |

Appeal from the Order Entered May 28, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-000120-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: F.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-A29041-19

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>APPEAL OF: S.C., BIOLOGICAL<br>MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 947 WDA 2019</td></tr>
</table>

Appeal from the Order Entered May 28, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-000121-2019

<table>
<tr><td>IN THE INTEREST OF: G.C., A<br>MINOR</td><td>:</td><td>IN THE SUPERIOR COURT OF<br>PENNSYLVANIA</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>APPEAL OF: S.C., BIOLOGICAL<br>MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 948 WDA 2019</td></tr>
</table>

Appeal from the Order Dated May 28, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): No. CP-02-DP-000122-2019

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED JANUARY 21, 2020**

S.C. (Mother) and J.B. (Father) appeal[1] from the Court of Common Pleas

of Allegheny County-Family Division (trial court) orders entered on May 28,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] While Mother and Father filed separate appeals, they filed identical briefs
raising the same issues related to the dependency adjudications. Therefore,
we address their arguments together and file an identical opinion in Father's
appeals filed at 977-981 WDA 2019.

- 2 -

2019, adjudicating their minor children, D.C., H.C., A.C., F.C. and G.C. (collectively, the Children) dependent.[2] They assert that the Children were entitled to legal and best interests counsel, that the trial court abused its discretion in admitting several pieces of evidence, and that the adjudications of dependency were not supported by clear and convincing evidence. After careful review, we affirm.

## I.

We glean the following facts from the record. Mother is the biological mother of H.C. (age 12), D.C. (age 8), A.C. (age 6), F.C. (age 4), and G.C. (age 3).[3] Father is the biological father of F.C. and G.C. and the stepfather to the remaining children.[4] Mother and Father are married and lived together with the Children for several years prior to the proceedings in this matter.

In early 2019, law enforcement received a ChildLine report that D.C. had alleged that Father had sexually abused him. This report was determined

---

[2] A separate order of dependency was entered for each child.

[3] These were the Children's ages at the time of the dependency hearings. Mother has one other Child, D.B., who was found not to be dependent after being placed in the care of his biological father. Additionally, the record reveals that during the pendency of this case, Mother and Father were expecting another child.

[4] The trial court determined that Father stands *in loco parentis* to his non-biological children. H.C., D.C. and A.C.'s biological father was present for the dependency proceedings and is a participant in these appeals. At the proceedings below, he stipulated to portions of the dependency petitions and admitted that he could not presently take custody of his children.

to be unfounded. However, a second ChildLine report was filed shortly thereafter alleging that H.C. had disclosed years of sexual abuse by Father. Law enforcement initiated an investigation into this report and took protective custody of all of the Children, placing them with their maternal grandmother. The Allegheny County Office of Children, Youth and Families (CYF) initiated dependency proceedings. Following a Shelter Hearing, Mother and Father moved into maternal grandmother's home and maternal grandmother moved into the family home with the Children.

All of the Children were forensically interviewed regarding the allegations. In her interview, H.C. disclosed that Father had sexually abused her from age six through ten. H.C. also stated that she had told Mother about the abuse in 2017 when Father continued to reside with the family. In an interview with a CYF investigator, H.C. stated that she had told Mother a year-and-a-half prior that Father had touched her inappropriately. After she disclosed the abuse to Mother, Mother and Father had a conversation with H.C. in which they told her that these were serious allegations and that it was a "big deal" to lie.

Following H.C.'s forensic interview, criminal charges were filed against Father, which were pending at the time of the dependency hearings. None of the other Children disclosed any instances of abuse in their forensic interviews. Relevant to this appeal, H.C. did not testify at the dependency hearing nor did CYF introduce the video recording of her forensic interview. Instead, Sergeant

Eric Egli of the McCandless Police, Detective Jeffrey Gumkowski of the Allegheny County Police, CYF caseworker Stephanie Schmidt, and forensic interviewer Sarah Gluzman testified to the substance of H.C.'s interview. In addition, the written reports describing H.C. and D.C.'s forensic interviews were admitted into evidence.

Mother testified at the dependency hearing regarding the disclosure H.C. made to her in 2017. She testified that in late 2017, she caught H.C., then ten years old, typing a sexually explicit email on an old phone.[5] Mother stated that none of the children was permitted to use electronic devices and that H.C. must have taken the phone from Father's nightstand.[6] Mother found nude photos on the phone that H.C. had taken of herself that she believed H.C. had intended to attach to the email.

When asked, H.C. initially told Mother that she was sending the email to a boy from school. She later said that she was sending the email to a classmate's older brother. Mother continued to question her about the email, and a few weeks later H.C. told Mother that Father had told her to send the email and given her the email address, but that she did not know who the recipient was. Mother testified that H.C. told her this while they were in the

_____

[5] H.C. was allegedly answering sexual questions in the email, saying that she liked to drink alcohol before sex to relax.

[6] Father testified that the phone was deactivated but he still used it to play games.

car but refused to talk about the allegation again.  Mother further testified that H.C. never told her about any physical sexual abuse.

Mother testified that after H.C. made this allegation, she immediately spoke to Father and told him that H.C. had said that he told her to send the email.  Father denied the allegation, and he and Mother agreed that he would never be alone with H.C. again.  Father and Mother then had a discussion with H.C. where Mother explained that she was making serious allegations that could ruin lives.  At that point, H.C. refused to talk about the email again.

Mother testified that she did not ask Father to leave the home, did not report the events to law enforcement or CYF and did not seek any therapeutic services for H.C.  She did not report the email because she was concerned that H.C. could be charged with distributing child pornography.  Mother testified that she never saw Father acting inappropriately with H.C. and she did not believe that allegation because he never had the opportunity to be alone with H.C.  She also said that she and Father had announced a new pregnancy a few days before H.C. made her disclosure and they believed that H.C. was not happy about the change.

Mother also testified that she did not believe H.C.'s allegations against Father were truthful and that H.C. had a history of lying.  Mother and Father moved forward with the process of having Father adopt his non-biological children, including H.C., in 2018.  They filed the adoption petition and petition

to terminate the biological father's parental rights in February 2019 after the Shelter Hearing in this case had taken place.[7]

Based on these facts, the trial court adjudicated the Children dependent and directed that they continue to reside with maternal grandmother. It further ordered that Mother would be permitted to have liberal unsupervised visits with all of the Children, including overnight visits once in-home services were initiated. Father was ordered to have no contact with his non-biological children and supervised contact only with his biological children.

Mother and Father simultaneously filed timely notices of appeal and statements of errors complained of on appeal pursuant to Rule 1925, and the trial court has filed a responsive opinion. Before addressing the merits of Mother and Father's challenge to dependency, we must address several structural and evidentiary matters that go to that challenge.

**II.**

Mother and Father argue that the trial court committed a structural error by not appointing a separate guardian *ad litem* (GAL) for H.C. and the remaining children, as well as separate legal counsel for the children other

---

[7] Father also testified at the dependency hearing and denied all allegations of abuse. He corroborated Mother's testimony that after H.C.'s disclosure regarding the email, he insisted that he never be left alone with H.C.

than H.C.[8]  They argue that while H.C.'s legal and best interests may have aligned, the other children's legal and best interests may have conflicted with H.C.'s.[9]

In a dependency proceeding pursuant to the Juvenile Act, the GAL is specifically authorized to represent both the child's best and legal interests. 42 Pa.C.S. § 6311(b) ("The [GAL] shall be charged with representation of the legal interests and best interests of the child at every stage of the proceedings.").  The GAL must "[e]xplain the proceedings to the child to the extent appropriate given the child's age, mental condition, and emotional condition."  42 Pa.C.S. § 6311(b)(8); Pa.R.J.C.P. 1154(8).  The GAL must then "[m]ake specific recommendations to the court relating to the appropriateness and safety of the child's placement and services necessary to address the child's needs and safety," while also "[advising] the court of the child's wishes to the extent that they can be ascertained and present to the court whatever evidence exists to support the child's wishes."  42 Pa.C.S. § 6311(b)(7), (9); Pa.R.J.C.P. 1154(7), (9).

_____

[8] We review such a claim for an abuse of discretion.  *In re J.K.M.*, 191 A.3d 907, 910 (Pa. Super. 2018).

[9] A child's legal interests "are synonymous with the child's preferred outcome." *In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017) (plurality).  In contrast, "'[b]est interests' denotes that a [GAL] is to express what the [GAL] believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees."  *Id.* at 174 n.2 (quoting Pa.R.J.C.P. 1154 cmt.).

While the plain language of the statute allows for a GAL to represent a child's legal and best interests even when the two diverge, our Supreme Court has suspended this provision and noted that such a divergence creates a conflict of interest for the GAL. *See In re Adoption of L.B.M.*, 161 A.3d 172, 175 n.4 (Pa. 2017) (plurality) (citing Pa.R.J.C.P. 1154 cmt). In such a case, the child is entitled to separate legal interests counsel. *Id.*

In *In re J.K.M.*, 191 A.3d 907, 914-15 (Pa. Super. 2018), we held that when a sixteen-year-old child was competent to direct legal representation and had clearly ascertainable legal interests that diverged from her best interests in a dependency action, the trial court abused its discretion by failing to appoint separate legal and best interests counsel. Significantly, the child was old enough to be presumed competent and to articulate her wishes to counsel and the court. *Id.* (citing *Rosche v. McCoy*, 156 A.2d 307, 309 (Pa. 1959)). However, we declined to hold that all conflicts require the appointment of both a GAL and legal interests counsel. *Id.* at 915-16.

Here, the GAL explained to the trial court that she did not believe the four younger children, whose ages ranged from three to eight years old, were competent to direct representation of their legal interests.[10] A team consisting of the GAL and a child advocate specialist had met with the children to

_____

[10] Mother and Father concede that H.C.'s preferred outcome aligned with the GAL's recommendation for her best interests, so separate legal counsel was unnecessary. *See* Briefs at 65-66.

- 9 -

determine their legal interests, which the GAL then relayed to the trial court. The GAL told the trial court that the children, excluding H.C., "all very much would like their mother to move back home, and they do refer to [Father] as their father." R.R. 614a-15a. However, she went on to explain:

> They have no idea what the allegations on the table are at all. They don't know what the safety concerns are at all. They can't appreciate or comprehend what's going on because they don't have that information. And I'm not saying they should have it, but for me to ask for legal counsel to be appointed for those children, they would need to fully understand the situation, to not only have the facts but have the ability to comprehend and be competent to actually be able to make me adequately represent them. I need somebody who can form an adequate and reasonable position so that I can represent them based on what's going on, and my assessment of the kids is that they are not competent. They do not know what's going on. There's been no testimony that they have been clued in to this situation.

R.R. at 615a-16a. The GAL concluded that all of the Children had the same best interests.

The GAL fulfilled her obligations to the Children under the statute and the trial court did not abuse its discretion in declining to appoint legal interests counsel for the younger four children. The statute specifically contemplates that a GAL tailor her conversations with a child "to the extent appropriate given the child's age, mental condition, and emotional condition." 42 Pa.C.S. § 6311(b)(8); Pa.R.J.C.P. 1154(8). Here, the GAL declined to explain the complete nature of the proceedings to the younger Children because she believed that telling them about H.C.'s allegations against Father would create

- 10 -

more trauma.[11]  The younger Children, who were three to eight years old, were considerably younger than the child at issue in **J.K.M.** and did not have the same presumption of competency to direct legal representation.  Even so, the GAL explained to the court that the younger Children did want Mother to live with them again and thought of Father as their father.

Thus, the GAL correctly balanced her duty to represent the Children's best interests, her duty to convey their preference to the court, and her duty to discuss the nature of the proceedings with the Children as appropriate to their ages, mental conditions and emotional conditions.  The younger Children's best interests aligned with the best and legal interests of H.C., who was the only child with a full understanding of the history that led to the Children's placement.  Consequently, the trial court did not abuse its discretion in declining to appoint separate legal interests counsel for the younger Children.

## III.

Next, we address Mother and Father's challenges to several of the trial court's evidentiary rulings.[12]  They challenge the admission of hearsay

---

[11] No party argues that the younger four children should have been informed about the full details of their removal from their parents and placement with maternal grandmother.

[12] "Our standard of review for evidentiary rulings by the trial court is very narrow.  In general, we may reverse only for an abuse of discretion or an error

statements by several witnesses who recounted H.C.'s disclosures of abuse. They also challenge the admission of Sergeant Egli's opinion testimony regarding H.C.'s credibility and contend that H.C.'s disclosures in the forensic interview were improperly admitted in violation of the best evidence rule. We address each of these arguments in turn.

**A.**

H.C. did not testify at the dependency hearing; rather, CYF presented testimony from several witnesses who recounted H.C.'s various allegations of abuse by Father and her 2017 disclosure to Mother. First, Sergeant Egli testified that he observed H.C.'s forensic interview and H.C. alleged that Father had subjected her to numerous acts of sexual abuse when she was six to ten years old. R.R. at 204a-07a. He also confirmed that H.C. stated that she told Mother about the abuse in the past, but he did not recall whether she described Mother's reaction to the disclosure. R.R. at 209a. Detective Gumkowski, who viewed a video of H.C.'s forensic interview, also testified to these same statements. R.R. at 226a-28a. He further testified that H.C. said that when she made the initial disclosure to Mother in 2017, Mother and Father confronted her about the allegations and told her it was a "big deal" to lie. R.R. at 228a. CYF caseworker Schmidt and forensic interviewer Gluzman

---

of law." ***Cruz v. Northeastern Hospital***, 801 A.2d 602, 610 (Pa. Super. 2002) (citation omitted).

similarly testified about H.C.'s statements in the forensic interview. R.R. 250a-51a, 257a-58a, 309a-11a. In addition, the written reports describing H.C. and D.C.'s forensic interviews were admitted into evidence. Mother and Father objected to the admission of these statements because they were hearsay.

This court recently addressed a similar argument in **In re I.R.R.**, 208 A.3d 514 (Pa. Super. 2019). There, the child was adjudicated dependent after she disclosed that she had been sexually abused by her father and that she had told her mother about the abuse a year prior, but her mother did not believe the allegations. **Id.** at 516. The child did not testify at the dependency proceedings, but the trial court admitted into evidence a forensic interview report of the allegations, a report from Child Protective Services (CPS), and the testimony of a CPS caseworker. **Id.** at 517. We held that the statements were properly admitted pursuant to the state of mind exception to the hearsay rule: "Testimony as to what a child tells other people is admissible in order to establish that child's mental state at the time he or she made the comment, particularly for purposes of identifying the child's needs for therapy and treatment." **Id.** at 519 (citing **In re Adoption of R.K.Y.**, 72 A.3d 669, 677

(Pa. Super. 2013) (internal quotations omitted)).  Thus, the hearsay statements were properly admitted for non-substantive purposes.  *Id.*[13]

Consistent with *I.R.R.*, H.C.'s statements in the forensic interview were properly admitted as non-substantive evidence of her state of mind and need for immediate treatment.  As discussed *infra*, CYF petitioned for dependency and the trial court granted the petitions based on Father's criminal case and Mother's reaction to H.C.'s disclosure and inappropriate sexual behaviors in 2017.  The hearsay statements at the hearing concerned both H.C.'s allegations of abuse against Father and her earlier attempt to talk to Mother about the allegations.  Regardless of their truth or falsity, the statements were relevant and admissible to demonstrate H.C.'s state of mind and ongoing need for treatment, as well as Mother's inaction when confronted with the allegations.  The trial court did not abuse its discretion in admitting these statements for these non-substantive purposes.

_____

[13] We reversed the adjudication of dependency and remanded for a new hearing in *I.R.R.* because, while the statements were properly admitted for non-substantive purposes, the trial court improperly relied on the truth of the matter asserted in the statements to make a specific factual finding that the child had been the subject of sexual abuse.  *Id.* at 521.  That factual finding was the basis for the child's dependency.  *Id.*  Here, however, CYF did not ask the trial court to make a factual finding that H.C. (or any of the Children) had been subjected to abuse.  As explained in Part IV, *infra*, the finding of dependency in this case was instead based on Mother's own testimony and her failure to protect and seek services for H.C. once she disclosed abuse and exhibited inappropriate sexual behaviors.

**B.**

Next, Mother and Father argue that the trial court erred in allowing Sergeant Egli to offer his opinion regarding whether H.C.'s disclosures in her forensic interview were credible. Sergeant Egli testified that based on witnessing over forty forensic interviews in his career and his six years of specialized experience investigating crimes against children, he believed that H.C. was credible.[14] R.R. at 204a-06a.

Expert witnesses are precluded under well-settled law from offering an opinion regarding a witness's credibility, as the fact-finder is the sole arbiter of credibility. *Commonwealth v. Maconeghy*, 171 A.3d 707, 778-79 (Pa. 2017). In a dependency proceeding, it is the trial court's duty to make determinations regarding the credibility of witnesses. *In re T.M.A.*, 207 A.3d 375, 380 (Pa. Super. 2019) (citation omitted). This made the admission of Sergeant Egli's opinion regarding H.C.'s credibility improper.

_____

[14] It is unclear from the record whether CYF intended to offer Sergeant Egli as an expert, and CYF did not address this point in its brief. Nevertheless, it appears from the record that the trial court treated this as expert testimony, as it requested that CYF lay a foundation regarding Sergeant Egli's qualifications and asked counsel if they would like to *voir dire* Sergeant Egli on that point before admitting the testimony. R.R. at 204a-06a. Because Sergeant Egli relied on his history, training and experience as a sexual assault investigator in offering this opinion, it appears that it was based on "specialized knowledge [] beyond that possessed by the average layperson." *See* Pa.R.E. 702(a), 701(c). Regardless of whether this constituted expert testimony, however, we find the admission harmless, as discussed *infra*.

Nevertheless, the admission of this testimony was harmless.[15]    As explained in Part IV, *infra*, the truth or falsity of H.C.'s statements in the forensic interview is immaterial to the adjudication of dependency. Dependency was based on the failure to respond and seek treatment for H.C.'s inappropriate sexual behaviors and her initial disclosure in 2017.   Sergeant Egli's opinion regarding the credibility of H.C.'s allegations in 2019 does not bear on this basis for dependency.

## C.

Third, Mother and Father argue that the trial court abused its discretion in admitting testimony describing the contents of H.C.'s forensic interview, which was recorded, in violation of the best evidence rule.  *See* Pa.R.E. 1002 ("An original writing, recording, or photograph is required in order to prove its content. . . ."). They argue that the best evidence rule required that CYF admit the full video of H.C.'s forensic interview into evidence rather than the testimony of individuals who had viewed the video.

Forensic interviewer Gluzman testified at the dependency hearing and described, based on her personal knowledge and recollection of the interview, the disclosures of abuse H.C. made during the interview.  R.R. at 309a-12a.

---

[15] An error is not harmless and the appellant is entitled to a new hearing if, "in light of the record as a whole, an erroneous evidentiary ruling could potentially have affected the decision." *In re A.J.R.H.*, 188 A.3d 1157, 1170 (Pa. 2018) (addressing harmless error in the context of a termination of parental rights proceeding).

- 16 -

Further, Sergeant Egli observed the interview through a window and described H.C.'s disclosures based on his observations. R.R. at 204a. Mother and Father did not object to this testimony on best evidence grounds. Gluzman and Sergeant Egli did not provide a description of the video; they merely recounted their memories of the interview as they had observed it. **See Commonwealth v. Steward**, 762 A.2d 721, 723 (Pa. Super. 2000) (holding that videotape was not necessary as "best evidence" of events when an eyewitness to the occurrence testified based on his own personal observations). Because this testimony was properly admitted, any error in the admission of the testimony of Detective Gumkowski and caseworker Schmidt on best evidence grounds was harmless.[16] That testimony was simply duplicative of the properly admitted testimony of Gluzman and Sergeant Egli. Now to the merits of the dependency adjudication.

## IV.

## A.

Mother and Father argue that the trial court's determination that the Children are dependent was not supported by clear and convincing evidence.[17]

---

[16] We again note that the truth or falsity of H.C.'s disclosures in the 2019 forensic interview were not the basis for the adjudication of dependency.

[17] In dependency proceedings, we review the juvenile court's order pursuant to an abuse of discretion standard of review. **In the Interest of H.K.**, 172 A.3d 71, 74 (Pa. Super. 2017). As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need

The Juvenile Act governs dependency proceedings. *See* 42 Pa.C.S. § 6301-6375. The Act permits a court to adjudicate a child dependent if it finds that he or she meets the requirements of one of ten listed definitions. The Act defines "dependent child" as follows, in relevant part:

> **"Dependent child."** A child who:
>
> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1).

In *In re G.T.*, 845 A.2d 870 (Pa. Super. 2004), this Court clarified the definition of "dependent child" further.

> The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

---

not accept the court's inferences or conclusions of law. *Id.* "[W]e accord great weight to the [juvenile] court's fact-finding function because the [juvenile] court is in the best position to observe and rule on the credibility of the parties and witnesses." *In re T.M.A.*, 207 A.3d 375, 380 (Pa. Super. 2019) (citation omitted; alterations in original). "'An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law.'" *In re A.T.*, 81 A.3d 933, 936 (Pa. Super. 2013) (quoting *In re J.R.*, 875 A.2d 1111, 1114 (Pa. Super. 2005)).

*Id.* at 872 (internal quotations and citations omitted); ***see also In re J.C.***, 5 A.3d 284, 289 (Pa. Super. 2010). As such, "the dependency of a child is not determined 'as to' a particular person" but rather hinges on whether the child meets the statutory definition of dependency. ***In re J.C.***, ***supra***. In making that determination, we address whether Mother or Father was available to provide proper parental care and control. Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." ***In re G.T.***, ***supra***.

This court has previously affirmed adjudications of dependency when one parent learned of sexual abuse by another parent but allowed the other parent to remain in the home. ***In re M.W.***, 842 A.2d 425, 429-30 (Pa. Super. 2004). A child can be found dependent even without a factual finding by the trial court that the child was the subject of abuse. ***In re R.P.***, 957 A.2d 1205, 1212-13 (Pa. Super. 2008) (citation omitted). A child may be found dependent if her parent's conduct "places the health, safety or welfare of the child at risk," even through failure to protect the child or seek treatment to maintain the child's physical or emotional welfare. *Id.* at 1213 (citing 42 Pa.C.S. § 6302(1)).

**B.**

In this case, the dependency petitions were not based on the truth of any of H.C.'s disclosures. Rather, as testified to by caseworker Schmidt, the

"concerns would be that when [H.C.] stated that [Father] was inappropriately touching her, [Mother] failed to protect [H.C.], she failed to get proper services for [H.C.], and she failed to protect her other children in the event [Father] could or could not be causing them harm as well." R.R. at 293a-94a. As a result, CYF contends that all of the Children were lacking proper care and control because Mother had failed or refused to protect them when confronted with the possibility that her husband posed a threat. CYF argues that, at minimum, H.C.'s sexual behaviors were inappropriate for her young age and should have prompted Mother to seek therapy or other treatment for H.C. to determine the cause of the behaviors. The record contains clear and convincing evidence to support these bases for dependency.[18]

Mother's own testimony provided clear and convincing evidence to support CYF's allegations of dependency. While Mother denied that H.C. had ever disclosed physical sexual abuse by Father, she did admit that H.C., at ten years old, had taken nude photographs of herself on a cell phone, wrote an email including sexually explicit content, and seemed to intend to attach the photographs to the email. These behaviors alone, given H.C.'s young age, should have prompted Mother to seek treatment for H.C.

_____

[18] Father and Mother primarily argue that the Children should not have been adjudicated dependent because, even if Father was not able to provide them with care and control due to the pending criminal charges, Mother was available and capable of providing that care and control. We focus much of our analysis on this argument.

When questioned, H.C. eventually stated that Father had told her to send the email. According to Mother's own testimony, she and Father together confronted H.C. about the allegation, emphasizing that she should not lie about the matter. She did not ask Father to leave the house and instead merely agreed that Father should not be alone with H.C. in the future, so as to prevent further allegations. At the dependency hearing, Mother expressed reservations about H.C.'s truthfulness. She admitted that she did not seek a forensic interview, assistance from law enforcement or any type of therapy for H.C. following this disclosure. She did not take steps to address or determine the cause of H.C.'s age-inappropriate sexual behaviors. Regardless of the veracity of H.C.'s disclosure, her behaviors clearly revealed a strong need for support and services that Mother failed to provide. Mother's failure to take appropriate action in response to H.C.'s disclosure was clear and convincing evidence that she was unable to provide care and control to the Children if it would jeopardize her relationship with Father.

Mother also insisted that Father had never been alone with H.C. in the year-and-a-half that had passed between H.C.'s initial disclosure and the dependency proceedings. However, the trial court found this testimony incredible and we are bound by that credibility determination. *In re M.W.*, *supra*, at 428 ("[W]e will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight

to the trial judge's credibility determinations."). Further, this argument neglects to acknowledge that Mother still allowed H.C. to be in contact with Father on a daily basis in the home after making her disclosure, even if the contact was supervised.

Despite the very serious allegations H.C. had made against Father, Mother and Father proceeded to file petitions to terminate the parental rights of her biological father so that Father could adopt H.C., D.C. and A.C. They took this step after the Shelter Care hearing in this case when all Children were in protective custody and well after Mother became aware of the full extent of H.C.'s allegations against Father. In addition, Mother continued to reside with Father while the dependency and criminal proceedings were ongoing despite the no-contact order that would have prevented the Children from visiting the home while Father was present.

Mother's actions show that she did not take seriously H.C.'s mental health and need for therapy or treatment or her obligation to protect H.C. when she was experiencing distress. Her reaction to the disclosures further casts doubt on Mother's ability to provide any of the Children with proper care and control if it interfered with her relationship with Father. The truth or falsity of H.C.'s allegations are ultimately irrelevant to the trial court's determination that Mother had consciously failed to provide care and control for her child when she made serious allegations of abuse against Father and was exhibiting inappropriate sexual behaviors.

Father's pending criminal charges also prevented him from providing the Children with proper care and control.[19] Due to the nature of the charges that had been filed against him, the criminal court entered a no-contact order prohibiting Father from having any contact with his non-biological children. As a result, Father was prevented by court order from providing H.C., D.C. or A.C. with proper care and control. Moreover, his biological children continued to reside in the same home with H.C., D.C. and A.C. Given the no-contact order and the nature of the pending criminal charges, which had proceeded past the preliminary hearing stage at the time of the dependency adjudication, the evidence was clear and convincing that Father was also incapable of providing care and control to any of the Children.

Finally, Mother and Father contend that the trial court abused its discretion in adjudicating the Children dependent based on "prognostic evidence" or "evidence that predicts a likelihood of unknown future harm rather than actual past harm." Briefs at 43. They maintain that there is no evidence that the Children, particularly those other than H.C., were ever

_____

[19] At oral argument, Father provided further facts regarding the current status of his criminal case. Because these facts were not available to the trial court at the time of the adjudication of dependency, they are not properly part of the record on appeal and we may not consider them. **See Ritter v. Ritter**, 518 A.2d 319, 323 (Pa. Super. 1986). Father may present this information for the trial court's consideration in any future review hearings.

subjected to any abuse or were exposed to any risk of harm. It is uncontested that H.C. was the only child to disclose abuse during a forensic interview.[20]

Again, we note that dependency "does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care." *In re R.P.*, *supra*, at 1211. "[A]cts and omissions of a parent must weigh equally since parental duty includes protection of a child from the harm others may inflict." *Id.* at 1212. While a child may not be found dependent merely because his or her sibling was adjudicated dependent, the sibling's adjudication may be relevant to the extent that it shows that the other children are also without proper parental care and control. *In re M.W.*, *supra*, at 429. A parent's inability to provide care and control to one child may evidence a genuine risk to the physical, mental and emotional health of all of the parent's children. *Id.*

Here, there was no substantive evidence of abuse suffered by the Children. However, Mother exhibited a pattern of behavior wherein she disregarded serious allegations made by H.C. and D.C., failed to investigate them, and failed to seek treatment when the two children exhibited vulnerability. Again, the crux of the dependency did not depend on the truth

---

[20] While there was a ChildLine report alleging that D.C. had said his "father" subjected him to sexual abuse, this report was determined to be unfounded. Nevertheless, we note that upon being informed of this report, Mother said she did not believe the allegation was true and did not think a forensic interview was necessary. R.R. at 202a, 210a-11a.

or falsity of the allegations made by H.C. or D.C. Dependency was based on the failure to react appropriately to the disclosures and to H.C.'s inappropriate sexual behaviors in 2017. On two occasions, Mother was unwilling to investigate allegations, seek therapy and protect the children from potential harm when they made statements accusing Father of sexual abuse. Instead, she chose to prioritize maintaining her relationship with Father over seeking help for her Children.

The trial court's finding that the Children were without proper parental care and control was not based on hypothetical prognostic evidence that they may in the future be subjected to abuse. The finding was based on a pattern of failing to protect and seek treatment for the Children when confronted with disturbing allegations and age-inappropriate behavior. The record reveals clear and convincing evidence that no parent was immediately available to support the Children's mental and emotional health in this way.

Accordingly, we conclude that there was clear and convincing evidence to support dependency.

Orders affirmed.

President Judge Emeritus Bender joins the memorandum.

Judge Kunselman files a concurring/dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/2020